BERT NELSON v. STATE OF NEBRASKA.

FILED OCTOBER 1, 1931. No. 27782.

*F. C. Radke* and *Magdalene Craft Radke,* for plaintiff in error.

*C. A. Sorensen, Attorney General,* and *Homer L. Kyle, contra.*

Heard before ROSE, DEAN, GOOD, EBERLY, DAY and PAINE, JJ., and HORTH, District Judge.

PAINE, J.

This is a proceeding in error by Bert Nelson, hereinafter called the defendant, from a conviction upon an information which charged him with selling 298 bushels of mortgaged corn in the first count, and with removing 75 bushels of mortgaged corn from Pawnee county without the written consent of the mortgagee in the second count. Upon the argument of the motion for a new trial, it was granted by the district court as to count two, but overruled as to count one, upon which count he was sentenced by the court.

The bill of exceptions consists of 236 pages, covering the testimony of some ten witnesses. The following brief statement gives a summary of the evidence upon some of the disputed questions.

I. B. Pope lives in Lincoln, is 73 years of age, and is agent of Mrs. Lou Auman, of Rupert, Vermont, who is the owner of the southeast quarter of section four, township three, range ten, Pawnee county, which farm was rented to the defendant for the year beginning March 1, 1927, under a written lease providing for the payment of $75 a year in cash for the pasture and buildings, together with a one-third share of the crops. The crop was short, defendant had sickness in the family and also suffered a loss from hog cholera, and although he paid the one-third share of all crops he was unable to raise the $75 cash rent.

However, the farm was rented to him for another year, beginning March 1, 1928. Two copies, not carbon copies, but each independent leases, were drawn and brought to·

the defendant in the field for signature. On the bottom of the lease was a form of promissory note, which could be detached at a dotted line. This note on the copy of lease retained by the agent, Mr. Pope, was filled in for $150 to cover the cash payments due for both years. In this lease it provided "that to secure the payment of the promissory note hereinbefore mentioned for $150, payable by lessee to lessor, or order, on the first day of January of the lease period, lessee agrees to and hereby does sell and mortgage unto the lessor, all the lessee's share under this lease in and to all the corn, wheat, oats, seed and hay, *to be planted* and sowed and grown on said real estate during the lease period."

The two copies of the lease vary as to date, for the one left with defendant's wife, when Mr. Pope went up to the house to get her to sign as a witness to her husband's signature, is dated March 1, 1928, while the one filed by Mr. Pope with the county clerk is dated "the ............ day of May, 1928," and was filed upon May 22, 1928, the promissory note for $150 being left attached to it at the time it was filed.

The date of the lease is very important as showing whether the corn crop which was mortgaged had yet been planted at the time the lease was signed. The defendant insists that the two copies of the 1928 lease were executed before the corn crop was planted. He claims that he was disking the ground in late March or early April, 1928, when the leases were signed by him out in the field; that on account of the heavy April snows the planting season was delayed until late in May. The information against Mr. Nelson fixes the date of the lease signing as May 8, but Mr. Pope's testimony is uncertain as to the exact date; he is only sure that the corn was nearly all planted. He did not know whether the machine with which Mr. Nelson was working was a lister or a disk, whether there were two leases or one signed that day, but he was sure the corn was in the ground.

The defendant's testimony was that the leases might have been signed late in March or early in April. Three

witnesses, Irvin Pyle, August Werman, and Hattie Nelson, testify that on May 13, 1928, Mr. Nelson had not yet begun to plant corn.

On this point the testimony of August Werman is corroborated by a memorandum which he made at the time. The defendant owed him money and he went over and bought 12 dozen eggs for setting. While waiting for Mrs. Nelson to get these eggs ready, he went out in the field and saw the defendant still disking, and testifies that no corn had been planted at that time. He made the entry in his account book as follows: "May 10, 1928, eggs for setting, 12 doz-25-$3," being a memorandum of a credit of $3 on the account that the defendant owed him and supporting his statement that up to May 10, 1928, the defendant had planted no corn, although the chattel mortgage lease and note were given at some date between the last of March and May 8, the date charged in the information upon which he was convicted.

Defendant Nelson testified that early in December, 1928, Mr. Pope gave him oral instructions at the farm to look around for a market for the corn as soon as husking was done and sell at the best price obtainable. Mr. Pope denied such a conversation. But on January 17, 1929, exhibit 7 shows that the defendant began hauling the corn to Mayberry, Nebraska, to Mr. Richardson, agent for the elevator owned there by the Derby Grain Company, of Topeka, Kansas, and hauled in 12 loads, amounting to over 600 bushels, at 71 cents a bushel, for which they gave him one check payable to himself for $211.80 and another payable to I. B. Pope for $175.73, both checks being dated January 22, 1929, when he finished hauling. In addition to this Mr. Pope testifies that the defendant left about 100 bushels of corn on the place when he moved off.

The defendant testifies that after he had sold this corn he went to the bank at Lewiston, where the note was payable, with the money to pay it, and asked them for the note and was told it was not there. The defendant then held the check payable to Mr. Pope for the landlord's share until February 8, 1929, when he wrote him a letter, which is exhibit 4 and reads as follows:

"Steinauer Nebr Febr 8, 1929. Mr. I. B. Pope Lincoln Nebr. Dear Sir—find inclosed check for rent corn—175.73 and if you will let me know where the contract and note is will pay the cash rent and oblige Bert Nelson."

The defendant, having written Mr. Pope in this letter that he wanted the note, admits that when Mr. Pope called to collect and said he did not have the note, but only a release of the mortgage, he became very angry. It is clear that a violent quarrel ensued, in which each one swore at the other, and that thereafter they were the bitterest of enemies.

The defendant testifies that as Mr. Pope left he said he would leave the release at the bank and whatever he left there would be all right. Defendant testifies that he went to the Bank of Lewiston two or three times to pay off this note, but the note was not there, simply a release, and he would not pay it until he got his note back, and that he did not see Mr. Pope again until he saw him in the courtroom after he had been arrested; but he testified that he had a telephone conversation with him on March 5, 1929, just before moving up to near Crab Orchard, and Pope said to leave everything on the place, and the defendant wanted $25 credit on the note for some wire fencing and other things he owned and was leaving there, or "if he could deliver me the note, I give him one hundred and fifty dollars and let me move this stuff; he wouldn't give me five cents for the property and wasn't delivering no note."

Doubtless shortly after this Mr. Pope did send the note to the Bank of Lewiston, but the defendant never came back to the bank after the bank held it, and on March 27, 1929, the bank, upon orders from Mr. Pope, mailed it to the county attorney, as shown by exhibit 17.

T. R. Richardson testified that he was connected with the Lewiston bank, and that Mr. Pope left a collection at the bank some time in the spring of 1929 with reference to settlement of some rental between him and Mr. Nelson. He left a release of a chattel mortgage, with instructions to turn it over to Mr. Nelson on payment of $150, but did not leave any note with the release. Within a few

days afterward Mr. Nelson came to the bank and asked for the note, and witness replied that Mr. Pope did not leave any notes, but left a release of a mortgage. Mr. Nelson refused to pay unless he got the note. Mr. Pope came back to the bank within a few days after Mr. Nelson was there, and witness told him why Nelson had refused to pay. Nelson did not object to the release, only he wanted the note. The note was later brought to the bank by Mr. Pope sometime after the 1st of March. Mr. Nelson never came in after the note was at the bank, and the note was not paid, and witness said he never told Mr. Nelson that the note was there, and the county attorney filed the information for his arrest upon April 18, 1929.

The elderly Mr. Pope is doubtless an energetic collector of rents for nonresident clients, and when crossed by a stubborn tenant easily lost his temper, and the testimony discloses that the defendant, on the other hand, did not restrain his anger in any way, and, as described in the brief of the state, "the defendant assumed a very truculent attitude, swore profusely, made violent accusations that the note and mortgage were forgeries and promised Mr. Pope that he would 'fix' him."

1. In count one the information charges that the defendant did on May 8, 1929, in due form mortgage to Mrs. Lou Auman an undivided two-thirds interest in the corn crop *then planted and growing* on this farm, and afterwards on January 16, 1929, the defendant unlawfully, fraudulently, knowingly, and feloniously, did sell, etc., 298 bushels to Derby Grain Company of Mayberry without first procuring the consent in writing of Mrs. Lou Auman.

In the opinion of this court the great weight of the evidence clearly sustains the contention of the defendant that the lease was signed by the defendant before any corn was planted and while he was at work disking in the field.

A chattel mortgage upon an unplanted crop or upon property not *in esse* is ineffectual to create a lien, either legal or equitable, in favor of the mortgagee until the intervention of some new act, and in support of this the defendant cites *Cole v. Kerr*, 19 Neb. 553; *Steele v. Ashen-*

*felter,* 40 Neb. 770; *Battle Creek Valley Bank v. First Nat. Bank of Madison,* 62 Neb. 825, 56 L. R. A. 124; *Brown v. Neilson,* 61 Neb. 765, 54 L. R. A. 328, 87 Am. St. Rep. 525; *American State Bank v. Keller,* 112 Neb. 761; *Thostesen v. Doxsee,* 78 Neb. 40; *Wilcox & Co. v. Deines,* 119 Neb. 692; *Skala v. Michael,* 109 Neb. 305; *Peterson v. Citizens Bank,* 117 Neb. 327.

Shepard's new Nebraska Citations call attention to an excellent article in 3 Nebraska Law Bulletin, 439, in which many of the cases above cited are reviewed, and it is said: "Nebraska courts have held that, in regard to attaching creditors and subsequent purchasers and mortgagees without notice, a mortgage on goods not *in esse* is not valid unless there is some subsequent intervening act by the mortgagee." The author says this "works a great hardship upon tenant farmers, as it makes it impossible for them to get money for the purpose of growing crops for the ensuing year, for if the mortgagee cannot be protected by constructive notice, he will not risk his money. The only way in which an agreement to give a mortgage could be treated as constructive notice when recorded would be to overthrow the whole rule that a mortgage on crops not yet planted is void."

2. However, the state insists that an amendment in 1927 changed the old law in Nebraska, and that as soon as the corn is planted and comes into existence it is under the mortgage by virtue of the new provision found as a part of section 36-301, Comp. St. 1929, and reading as follows: "Provided, that the filing of a lease containing an agreement for the execution of a chattel mortgage, or, therein constituting a chattel mortgage, on unplanted crops shall constitute *notice of such an obligation and lien* and protect the lessor against chattel mortgages given to other creditors by the lessee;" etc.

We see nothing in this amendment which changes the Nebraska law or the decisions cited except that the "notice" protects the landlord as against any additional chattel mortgages which the renter might give later to other creditors after he had signed the lease.

It requires a strained construction of this provision to read into it a declaration of law setting aside all former holdings of our court to the effect that the lien of a chattel mortgage on a crop of corn not planted will not attach to the crop, even when it comes into existence, unless possession is taken by the mortgagee. *Cole v. Kerr,* 19 Neb. 553. As said by Goss, C. J., in *Peterson v. Citizens Bank,* 117 Neb. 327, "the reason for the rule is that the thing mortgaged has no existence."

It is said that prior to the passage of this amendment for the protection of the landlord against dishonest tenants several cases have come before this court in which the court, in its own language, was "constrained" to give priority to the claims of others over the claim of the landlord for his rent from the crops, namely, in *American State Bank v. Keller,* 112 Neb. 761; *State Bank of Gering v. Grover,* 110 Neb. 421.

3. In considering this 1927 amendment, set out above, the district court referred to this new law in instruction No. 3 given the jury, in the following words: "The statutes further provide that the filing in the county clerk's office of a lease containing an agreement for the execution of a chattel mortgage, or therein constituting a chattel mortgage, on unplanted crops shall constitute *such a lien.* The language used in the lease, exhibit 2, and in exhibit 6, does create a valid chattel mortgage lien on the crops therein named, those then unplanted as well as those that were planted, at the time the lease was signed."

It will be seen that the district judge, in making a quotation from a portion of section 36-301, Comp. St. 1929, closes his quotation by substituting the three words italicized above, to wit, "such a lien," in the place of the words as found in the statute, which are, "notice of such an obligation and lien and protect the lessor against chattel mortgages given to other creditors by the lessee."

In the opinion of the court his statement might be understood by jurors to mean that a chattel mortgage on unplanted crops found in such a lease was an absolute chattel mortgage, which is not the law and may have confused the jury in arriving at their verdict.

As the Nebraska cases clearly hold that a mortgage upon unplanted corn is invalid upon which to base a conviction such as this, the defendant offered this instruction, No. 2: "You are further instructed that in order to establish the chattel mortgage in this case as a valid chattel mortgage, it will be necessary, among other things, for the state to prove beyond a reasonable doubt that the crop of corn in question was planted and growing at the time the said mortgage was given; and if you should find from the evidence that the said crop of corn was not planted and growing at the time the alleged mortgage was given you will find the defendant not guilty." But the district judge refused to give this requested instruction, which we hold should have been given under the evidence in this case. *Mays v. State,* 33 Okla. Cr. 185.

4. There is considerable discussion in the briefs about the court's instruction on "tender," being instruction No. 11. The two portions in dispute read as follows: "The note, exhibit No. 3, was made payable at the Bank of Lewiston. The defendant had the right to go to said bank at any time after it was due, *and tender the money in payment* to the bank the amount of the note and demand the note. * * * Of course, the defendant was not obliged to actually pay the money for the note until the note was surrendered to him. The tender of payment, the actual offering of the money to pay the note, would operate to discharge the mortgage."

Under our negotiable instruments law a portion of section 62-601, Comp. St. 1929, reads as follows: "Presentment for payment is not necessary in order to charge the person primarily liable on the instrument; but if the instrument is, by its terms, payable at a special place, and he is *able and willing to pay it there* at maturity, such ability and willingness *are equivalent to a tender* of payment on his part."

The evidence on this point appears to be that the defendant received a check for his part of the corn from the elevator on January 22, 1929, in the amount of $211.80, and on February 8 he mailed the check of $175.73 to Mr.

Pope, to whom it was payable, and he testifies that just before February 8 he went to the Bank of Lewiston to pay the note, and that a few days after that Mr. Pope came to the place without the note, and he understood he would send it to the bank, so he went back there again to see if it was there and he would pay it off. The testimony shows that he carried his own check of $211.80 from January 22, 1929, the day he received it from the elevator, until he finally deposited it in his own bank account in the Farmers State Bank of Tecumseh on February 19, 1929, a period of 28 days, during all of which time he was ready, able and willing to pay off the note with the $211.80 check which he was carrying around for that purpose.

Nebraska courts have held many times that a formal tender of money is never required, where it is disclosed, if it had been made, it would have been fruitless. *Graham v. Frazier,* 49 Neb. 90; *Bundy v. Wills,* 88 Neb. 554.

Circumstances may justify a failure to actually count out the money. "So in the case of a note payable at a named place, a readiness at the time and place of payment, although the note is not there, is equivalent to a tender." 26 R. C. L. 623, sec. 2.

"An effective tender can be made without actually producing, exhibiting, and counting the money at the time of the offer to pay." *Texas Auto Co. v. Clark,* 12 S. W. (2d) 655.

Justice Oliver Wendell Holmes, in *Simmons v. Swan,* 275 U. S. 113, said: "But the jury might find also that the defendant's behavior signified a refusal to go farther with the matter and therefore that the plaintiff was not called upon to do anything more."

In case a note is payable at a special place, as a certain bank, the appearance of the debtor at that place and an ability and readiness to pay at the time and place of payment, although the note is not there, is equivalent to tender. *United States Nat. Bank of Red Lodge v. Shupak,* 54 Mont. 542; *Mechanics American Nat. Bank v. Helmbacher,* 199 Mo. App. 173; *Moore v. Knemeyer,* 271 S. W. (Tex. Civ. App.) 653.

5. A letter of most unusual interest was attached to the affidavits for a motion for new trial. The defendant had testified that he had not received a letter from Mr. Pope directing him to sell the corn in question, but had been so instructed by word of mouth. The statute, section 69-109, Comp. St. 1929, upon which the conviction was based, reads that if the defendant sells the mortgaged property "without first procuring the consent, in writing, of the owner," etc. After the trial the defendant's wife was sure that Mr. Pope had written her husband such a letter authorizing him to sell the corn. The story the wife tells is that she made vigorous search and, although they had moved four times since it was received, she finally found the important letter in a box of the children's cast-off toys, where they had been playing post-office with old letters. This letter, all admit, is a genuine letter, on Mr. Pope's letterhead and in his handwriting. It appears in the bill of exceptions on page 212. In it Mr. Pope, as agent of mortgagee, uses this language: "As weather, roads, health, etc., will not permit me to come down at this time I will say you get prices on our corn if prices are satisfactory with you at all sell the corn do the best you can I don't think there would be anything gained in way of price by holding"— thus giving the defendant the consent of mortgagee in writing to sell.

The state at once charged that this letter has had the date 1927 changed to a year later by making the "7" into a figure "8," and in their brief make this statement: "In the instant case, it is obvious that counsel, in the matter of the missing letter, have been imposed upon by an unscrupulous client. A casual examination with the naked eye shows plainly that there has been an erasure of the original date and the figure '8' has been substituted for whatever figure formerly appeared."

It is clear to one who carefully examines this letter that the figure "8" has been made with the light line of a sharpened leadpencil, but as to an erasure having been made it is very difficult to determine, for the letter has been so soiled by much handling.

The defendant in his affidavit answers that the letter could not have been written in the year 1927 for Mr. Pope sold the corn himself that year and had no occasion to write such a letter.

This letter is of outstanding importance. If it was written in 1928 it disposes of this case by giving the defendant written authority to sell the corn that he stands convicted of selling without authority. If, on the other hand, the defendant has fabricated a piece of evidence by inserting a new date in an old letter, this fact would doubtless increase the sentence given him in case of a second conviction.

But the jury are the sole judges of this evidence and of the weight to be given to it. Upon a new trial the best handwriting experts can examine this letter with the greatest ·care for both sides and with their assistance a jury can determine the truth of the matter. If, with the help of the testimony of such experts, the jury believe that this letter was written in 1928, then it is a vital and important piece of evidence germane to the question of the guilt or innocence of the accused. When evidence is so sharply conflicting upon a point going directly to the gist of the offense, it is clearly for the jury.

It has been held by this court that a motion for new trial will not be granted where the newly discovered evidence is simply cumulative and which could not affect the result. *Keim & Co. v. Avery,* 7 Neb. 54; *Hill v. Helman,* 33 Neb. 731; *Campion v. Lattimer,* 70 Neb. 245; *Christoffersen v. Weir,* 110 Neb. 390.

But, on the other hand, a new trial should be granted when such newly discovered evidence might change the result of the trial. *Williams v. Miles,* 73 Neb. 193. Or where the new evidence was not merely cumulative. *City of Lincoln v. Holmes,* 20 Neb. 39; *Coon v. Drainage District,* 99 Neb. 138; *Henderson v. Edwards,* 191 Ia. 871, 16 A. L. R. 1090; *Vickers v. Phillip Carey Co.,* L. R. A. 1916C, 1164, note.

If newly discovered evidence presents a material and important fact, germane to the issue in controversy, which,

considered with the evidence presented on the trial, might cause a jury to take the other view, then a new trial should be granted, if diligence to secure the same has been shown.

For errors herein set out, it is ordered that the judgment and sentence of the court be set aside and a new trial ordered.

REVERSED.